**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| JANE DOE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:23-CV-00768-AGD |
| | § | |
| FRISCO INDEPENDENT SCHOOL | § | |
| DISTRICT, et al., | § | |
| | § | |
| Defendants. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Pending before the court is Defendant Frisco Independent School District's ("FISD") Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. #29) and Defendant City of Frisco, Texas's ("City") Corrected Motion to Dismiss (Dkt. #40).[1] Having reviewed the respective Motions to Dismiss, Responses, Replies, Sur-Replies, and all relevant pleadings, the court finds that Defendant FISD's Motion to Dismiss (Dkt. #29) should be denied, and Defendant City's Motion to Dismiss (Dkt. #40) should be denied.

**FACTUAL BACKGROUND[2]**

The allegations in Plaintiff Jane Doe's[3] ("Plaintiff") First Amended Complaint are centered around, in part, the sexual assault she suffered at the hands of former City police officer and FISD School Resource Officer ("SRO"), John Hoover ("Hoover"). At all times relevant, Hoover served as an SRO for FISD at Staley Middle School (Dkt. #17 at p. 13). In August 2021,[4] Hoover was

---

[1] The City's original Motion to Dismiss (Dkt. #38) was superseded by its Corrected Motion to Dismiss and is therefore **DENIED AS MOOT**.

[2] For purposes of analyzing the motions before the court, the facts stated in this section are those alleged in Plaintiff's First Amended Complaint.

[3] The sexual abuse alleged in Plaintiff's First Amended Complaint (Dkt. #17) occurred when Plaintiff was a minor, so she requested to proceed in the litigation anonymously under the pseudonym "Jane Doe." (Dkt. #17 at p. 2).

[4] The court takes judicial notice that Hoover was arrested in August 2021, as confirmed by Plaintiff's Amended Complaint (Dkt. #17 at p. 23).

arrested and charged with Sexual Performance by a Child in violation of Texas Penal Code § 43.25 (Dkt. #17 at p. 13). The charges stemmed from Hoover's sexual abuse of Plaintiff. Ultimately, Hoover pleaded guilty to Improper Relationship Between Educator and Student, a second-degree felony offense. (Dkt. #17 at p. 13).

### FISD Employees Notice Hoover's Behavior with Female Students

Plaintiff alleges that Hoover was selected in 2018 to serve as an SRO for FISD and was under the supervision of City's police department (Dkt. #17 at p. 13). While serving as an SRO, "Hoover routinely welcomed female students into his office to get jolly rancher candy." (Dkt. #17 at p. 13). Staley Middle School administration and staff noticed that female students were frequently tardy to class because they were in Hoover's office (Dkt. #17 at p. 13). Staley Middle School Principal Anita Robinson observed Hoover sitting on the cafeteria steps surrounded by female students and informed then-Police Chief Chadd Springer ("Springer") and FISD Human Resources about Hoover's interactions with female students (Dkt. #17 at p. 13). In April 2021, after Principal Robinson witnessed Hoover signing the yearbooks of the female students who were surrounding him, she called the Memorial High School principal "to give her a heads up" about Hoover's closeness to a particular group of 8th grade female students (Dkt. #17 at pp. 13–14). No corrective action was taken based on the above observations (Dkt. #17 at pp. 13–14).

Plaintiff alleges that other Staley Middle School staff noticed Hoover's interactions with female students. Julie Barrentine ("Barrentine"), Staley Middle School's counselor, worked alongside Hoover to counsel abused students (Dkt. #17 at p. 14). Upon Hoover's termination following the sexual assault of Plaintiff, Barrentine "was immediately concerned about" a former Staley Middle School female student who had moved to high school (Dkt. #17 at p. 14). Barrentine was aware that Hoover was close with this female student's family and had given this female

REPORT AND RECOMMENDATION – Page 2

student his personal cell phone number without her mother's knowledge (Dkt. #17 at p. 14). Barrentine noticed that Hoover bonded closely with the female students and did not similarly bond with male students (Dkt. #17 at p. 14). Barrentine was aware that female students would frequently spend time in Hoover's office, retrieve candy from Hoover, and leave notes on Hoover's whiteboard (Dkt. #17 at p. 14). Barrentine allegedly stated that Hoover "was just really friendly with the girls." (Dkt. #17 at p. 14).

Plaintiff also alleges that Jenelle Reyes ("Reyes"), another Staley Middle School employee, observed similar behavior from Hoover (Dkt. #17 at p. 14). Reyes "noticed that Hoover was always only around female students." (Dkt. #17 at p. 14). When Reyes would attempt to reprimand female students in front of Hoover, Hoover would laugh (Dkt. #17 at p. 14). Reyes also observed Hoover providing candy to female students and female students leaving notes on Hoover's whiteboard (Dkt. #17 at p. 14). Plaintiff also alleges, upon information and belief, that Hoover had a history of disciplinary issues as an SRO for FISD (Dkt. #17 at p. 14).

### *Hoover Grooms Plaintiff*

In June 2021, Plaintiff volunteered for a summer Junior Police Academy program ("2021 JPA Program") on FISD's Pearson Middle School campus, and Hoover was an instructor during the seven-week 2021 JPA Program (Dkt. #17 at p. 14). Plaintiff was a sixteen-year-old girl, and Hoover was a thirty-four-year-old man (Dkt. #17 at p. 15). Plaintiff alleges that Hoover began making sexual jokes with her during the program and that between July 2021 and August 7, 2021, Hoover called and texted Plaintiff regularly (Dkt. #17 at p. 15). Plaintiff claims the communications occurred at all hours of the day and night (Dkt. #17 at p. 15). Plaintiff also asserts that there were thirty-eight calls during this period, with one phone call lasting two hours and twenty-three minutes (Dkt. #17 at p. 15).

According to Plaintiff, Hoover said Plaintiff was "like an 'adopted daughter,'" called her "babygirl," and told her that he "knew her 'very well' and needed her 'to know that [he] care[d] deeply.'" (Dkt. #17 at p. 15). Plaintiff claims Hoover would compliment "her breasts and butt," and he told her that he got "distracted" when she wore leggings (Dkt. #17 at p. 15). Plaintiff asserts that Hoover told her he had a vasectomy, so he could not get "anyone" pregnant (Dkt. #17 at p. 15). Hoover allegedly admitted to Plaintiff that they had met two years prior, when she was fourteen, and Hoover "accidentally grabbed her butt and he was afraid she would tell her dad about it." (Dkt. #17 at pp. 15–16). Plaintiff alleges that Hoover told Plaintiff he "wanted to tie her up and handcuff her." (Dkt. #17 at p. 16).

Plaintiff claims Hoover encouraged her to get her own cell phone so she did not have to worry about getting in trouble (Dkt. #17 at p. 16). Hoover encouraged Plaintiff to live with her mom because she had fewer rules than Plaintiff's dad (Dkt. #17 at p. 16). Hoover suggested Plaintiff could come to his house and just claim that she was babysitting (Dkt. #17 at p. 16). Hoover also knew personal details about Plaintiff, such as: (1) Plaintiff had been sexually assaulted as a child; (2) many of Plaintiff's family members were in law enforcement, so she trusted the police; (3) Plaintiff had a hard time telling people no; (4) Plaintiff had suicidal thoughts in the past; and (5) Plaintiff had sex with her ex-boyfriend because she felt pressured to do so (Dkt. #17 at p. 16).

### SROs Notice Hoover's Behavior Toward Plaintiff

Plaintiff volunteered for the JPA for years leading up to the summer 2021 JPA Program and was familiar with many of the police officers who worked the JPA (Dkt. #17 at p. 16). The SROs were aware the Plaintiff was friendly and affectionate toward the SROs, and at least one SRO had a conversation with Plaintiff about her "being too comfortable with the SROs." (Dkt. #17 at p. 17). During the 2021 JPA Program, a number of SROs noticed how "odd" Plaintiff and

Hoover's interactions were, and one SRO commented that Hoover "had not yet 'figured out how to get away' from Plaintiff's friendly behavior." (Dkt. #17 at p. 17).

Even after Plaintiff admitted to one SRO to dealing with personal issues during the 2021 JPA Program, no SRO intervened when Plaintiff and Hoover were seemingly behaving too comfortable with one another (Dkt. #17 at p. 17). Indeed, on multiple occasions, Officer Kerri Jones ("Officer Jones") noticed Plaintiff and Hoover hanging around each other "very closely." (Dkt. #17 at p. 17). Officer Jones noticed Plaintiff frequently hug Hoover from behind, wrapping her arms around his waist or chest (Dkt. #17 at p. 17). Officer Jones witnessed Hoover and Plaintiff sitting together during lunch at the table reserved for SROs (Dkt. #17 at p. 17). Officer Jones also noticed, on several occasions, Plaintiff and Hoover hanging out in the parking lot after everyone had left the 2021 JPA Program for the day (Dkt. #17 at p. 17).

During the weeks of July 19–22, 2021, SRO Wilcox ("Officer Wilcox") observed Plaintiff and Hoover having breakfast and lunch together frequently (Dkt. #17 at p. 17). Officer Wilcox observed Plaintiff wearing Hoover's baseball cap during the 2021 JPA Program (Dkt. #17 at p. 17). Officer Wilcox also witnessed Plaintiff and Hoover leave campus to get lunches for themselves and other SROs (Dkt. #17 at p. 17). Additionally, Officer Wilcox observed Plaintiff and Hoover spending more time together than other volunteers and SROs, and on at least one occasion, Officer Wilcox saw Plaintiff leaning against Hoover with her back to his chest (Dkt. #17 at pp. 17–18).

SRO D. Ramos ("Officer Ramos"), during the 2021 JPA Program, also observed the behavior between Plaintiff and Hoover (Dkt. #17 at p. 18). Officer Ramos witnessed Plaintiff sitting at the officers' table with Hoover, and Plaintiff and Hoover frequently hanging out with

each other (Dkt. #17 at p. 18). Officer Ramos described Plaintiff wearing Hoover's hat as "weird." (Dkt. #17 at p. 18).

On August 5, 2021, Hoover and SRO T. Craig ("Officer Craig") went to a nearby restaurant that Hoover recommended (Dkt. #17 at p. 18). On the way, Hoover mentioned to Officer Craig that Plaintiff worked at this restaurant (Dkt. #17 at p. 18). During the meal, Plaintiff sat next to Hoover at the table on several occasions (Dkt. #17 at p. 18). Officer Craig saw Plaintiff and Hoover "being very friendly with each other and at times pok[ing] one another in the sides in a playful manner." (Dkt. #17 at p. 18). Hoover mentioned to Officer Craig that Plaintiff had been sexually assaulted, that Plaintiff was like a daughter to Hoover, that Plaintiff had Hoover's personal cell phone number, and that Plaintiff was like another "adopted daughter" Hoover had at a different FISD high school (Dkt. #17 at p. 18).

SRO Crouch ("Officer Crouch") worked the 2021 JPA Program during four different weeks (Dkt. #17 at p. 18). Officer Crouch noticed Plaintiff and Hoover sitting together occasionally, and Hoover welcomed Plaintiff's presence (Dkt. #17 at p. 19). Officer Crouch observed Plaintiff and Hoover discussing Plaintiff's recent breakup, and Officer Crouch believed it to be odd behavior (Dkt. #17 at p. 19). Officer Crouch noticed "'concerning' behavior" between Plaintiff and Hoover, including the two constantly being near each other, having no regard for personal boundaries, standing "uncomfortably close to each other," and touching each other inappropriately (Dkt. #17 at p. 19). Officer Crouch witnessed on one occasion, Plaintiff massaging Hoover's shoulders on the bleachers and, on another occasion, Hoover "embrac[ing]" Plaintiff from behind (Dkt. #17 at p. 19). Officer Crouch noted that all of this "'concerning' behavior" occurred out in the open, and he "never once observed anything that wasn't clear and visible to everyone in their proximity." (Dkt. 17 at p. 19).

Another SRO, Baughman ("Officer Baughman"), observed behavior between Plaintiff and Hoover that he believed to be odd, including Plaintiff scratching or massaging Hoover's back or the two tickling each other (Dkt. #17 at p. 19). Officer Baughman, while viewing such interactions as odd, "didn't have any prior information to see it as inappropriate," and "did not feel it 'was egregious enough to speak with Hoover about it.'" (Dkt. #17 at p. 19).

Finally, during the first two weeks of the 2021 JPA Program, SRO B. Thomason ("Officer Thomason") remarked that Plaintiff and Hoover "had become strangely close." (Dkt. #17 at p. 19). Officer Thomason unlocked a room and found Plaintiff and Hoover talking in the room alone (Dkt. #17 at p. 19). That same day, Officer Thomason observed Plaintiff and Hoover talking alone in the parking lot (Dkt. #17 at p. 19). After a while, Officer Thomason observed instances that "started to add up and were strange," one of which being Plaintiff and Hoover running errands to pick up lunch for the other SROs during the 2021 JPA Program (Dkt. #17 at p. 19). All-in-all, Plaintiff alleges at least seven SROs observed Hoover's "odd" or "inappropriate" behavior towards Plaintiff, but no one raised any issues (Dkt. #17 at p. 20).

### *Hoover Coerces Plaintiff into Sexual Relationship*

During the 2021 JPA Program, Plaintiff turned seventeen (Dkt. #17 at p. 20). Thinking Plaintiff had reached the age of majority, Hoover began pursuing a sexual relationship with Plaintiff and engaged in sexual activity with Plaintiff on four separate occasions  (Dkt. #17 at p. 20). Plaintiff did not welcome the sexual interactions (Dkt. #17 at pp. 20–22).

The first sexual encounter occurred after Hoover and Plaintiff ate lunch together at a restaurant in Frisco (Dkt. #17 at p. 20). After lunch, the two sat in Plaintiff's car where Hoover sexually assaulted Plaintiff and joked that they should "get[] in the back seat of the car and do other things." (Dkt. #17 at p. 20). During this incident, Hoover was on duty and wearing a "cop

shirt." (Dkt. #17 at p. 20). Hoover also told Plaintiff that "he had to turn off his work cell phone so that he could not be tracked." (Dkt. #17 at p. 20).

The second sexual encounter occurred after Hoover and Plaintiff shared another lunch together; this time, Plaintiff hardly ate "because she was shaking and nervous the entire time." (Dkt. #17 at p. 20). After lunch Hoover followed Plaintiff home and commented on how much she had been shaking (Dkt. #17 at p. 20). Hoping to avoid another encounter like the last, Plaintiff turned on Netflix (Dkt. #17 at p. 20). While Plaintiff was pacing and visibly nervous, Hoover told Plaintiff to "come here" and to calm down (Dkt. #17 at pp. 20–21). Hoover then began hugging and kissing Plaintiff, and ultimately, engaged in sexual intercourse with Plaintiff (Dkt. #17 at p. 21). During this interaction, Hoover used his bicep and arm to choke Plaintiff without her consent (Dkt. #17 at p. 21). Plaintiff did not stop the assault because she thought it was too late and did not want to upset Hoover (Dkt. #17 at p. 21). Plaintiff recalled Hoover telling her that he liked putting people in "rape choke holds" and enjoyed watching Plaintiff squirm (Dkt. #17 at p. 21). As with the first incident, Hoover was on duty, wore a "cop shirt," and turned his work cell phone off so he could not be tracked (Dkt. #17 at p. 21). Because Hoover had his gun with him, Plaintiff was not sure she could stop Hoover, and she did not feel free to leave (Dkt. #17 at p. 21). Plaintiff alleges she felt forced into Hoover's sexual misconduct because she was isolated, because Hoover was in a position of authority, and because she feared the sexual and physical assaults would escalate if she resisted (Dkt. #17 at p. 21).

On two other occasions, Hoover engaged in sexual intercourse with Plaintiff against her will; one time using the weight of his body to pin Plaintiff down and another time using sex toys during the encounter (Dkt. #17 at pp. 21–22). Each time, Hoover was on duty, wore his "cop shirt," and turned his work cell phone off so his location could not be tracked (Dkt. #17 at pp. 21–22).

Plaintiff claims that Hoover used his position of trust and authority as an SRO to engage in a sexual relationship with Plaintiff (Dkt. #17 at p. 22). Hoover made it known that he had his gun on him during his conversations and sexual encounters with Plaintiff (Dkt. #17 at p. 22). Hoover told Plaintiff that he "ran her license plates, knew where she lived, and knew where she parked her car while she was at her dad's house." (Dkt. #17 at p. 22). Hoover told Plaintiff he knew how to use "truth serum," that he was "evil and sadistic," about arrests he had made, and about how he "knew people" and knew how to pass a lie detector test (Dkt. #17 at p. 22).

Plaintiff claims Hoover acted under color of law by engaging in the following:

a.  Hoover's relationship with Plaintiff grew out of his role as an SRO in JPA, a legitimate police activity;
b.  Hoover took advantage of his position of authority as an SRO at JPA;
c.  Hoover used the authority of his position by telling Plaintiff he ran her license plates and knew where she parked her car;
d.  Hoover used the authority of his position by telling Plaintiff that he would use truth serum on her if he had to;
e.  Hoover coerced Plaintiff into complying by referencing he had his gun;
f.  Hoover gave the implicit threat that he would never be held accountable because he could pass a lie detector test; and
g.  Hoover was on duty during each instance of sexual misconduct.

(Dkt. #17 at pp. 22–23).

Hoover was arrested on August 13, 2021, and charged with Sexual Performance by a Child in violation of Texas Penal Code § 43.25 (Dkt. #17 at p. 23). On February 17, 2023, Hoover pleaded guilty to a charge of Improper Relationship Between Educator and Student in violation of Texas Penal Code § 21.12, and Hoover was sentenced to 10 years of deferred adjudication community supervision (Dkt. #17 at p. 23).

Plaintiff alleges that the encounters have had a lasting impact on her, affecting her physically, psychologically, and academically (Dkt. #17 at p. 23). Plaintiff has suffered from depression and post-traumatic stress disorder (Dkt. #17 at pp. 23–24). Plaintiff has also become

"extremely paranoid about going to work and being around other police officers." (Dkt. #17 at p. 24).

## PROCEDURAL HISTORY

Plaintiff originally filed the instant lawsuit against Defendants FISD, Frisco Police Department, and Hoover on July 24, 2023, in the 380th District Court of Collin County, Texas, Cause No. 380-03836-2023 (Dkt. #1, Exhibit 6). On August 24, 2023, Defendants removed the case to the United States District Court for the Eastern District of Texas, Sherman Division (Dkt. #1). On August 27, 2023, Defendant Frisco Police Department filed a Motion for Judgment on the Pleadings asserting that it "has no jural existence and cannot be sued." (Dkt. #4 at p. 1). United Stated District Judge Amos L. Mazzant, III granted Defendant Frisco Police Department's Motion for Judgment on the Pleadings on September 25, 2023 (Dkt. #9). On October 24, 2023, Judge Mazzant referred the case to the undersigned for all pre-trial proceedings (Dkt. #14).

On December 13, 2023, Plaintiff filed an Amended Complaint, dropping Defendant Hoover and adding Defendants City and Springer (Dkt. #17). Defendant FISD filed a Motion to Dismiss on January 16, 2024 (Dkt. #29). Then, after receiving consent to proceed before a Magistrate Judge from all parties, Judge Mazzant referred the case to the undersigned for all further proceedings and the entry of judgment (Dkt. #31). On January 30, 2024, Plaintiff filed a Response to FISD's Motion to Dismiss (Dkt. #35). On February 6, 2024, FISD filed a Reply (Dkt. #36). Then, on February 13, 2024, Plaintiff filed a Sur-Reply (Dkt. #37).

On February 28, 2024, Defendants City and Springer filed a Motion to Dismiss (Dkt. #38). Asserting immunity defenses, Defendants City and Springer filed an opposed Motion to Stay (Dkt. #39), which the court granted on March 26, 2024 (Dkt. #45). Defendants City and Springer filed a Corrected Motion to Dismiss on March 7, 2024 (Dkt. #40). Plaintiff filed a Response to

Defendant City and Springer's Motion to Dismiss on March 13, 2024 (Dkt. #42). Defendants City and Springer filed a Reply on March 19, 2024 (Dkt. #44), and Plaintiff filed a Sur-Reply on March 26, 2024 (Dkt. #46). Then on August 20, 2024, Plaintiff filed a Notice of Voluntary Dismissal regarding Defendant Springer (Dkt. #47). Also, on August 20, 2024, Plaintiff filed an opposed Motion to Lift the Stay now that Defendant Springer is no longer a party, removing any immunity claims (Dkt. #48). On August 26, 2024, Defendant City filed a Motion to Stay Discovery and Abatement of Order for Rule 26 Conference Pending Determination of Motion to Dismiss (Dkt. #49). Plaintiff and Defendants have filed respective Responses (Dkt. #50; Dkt. #51; Dkt. #53). Defendant City filed a Reply to Plaintiff's Response to City's Motion to Stay on September 7, 2024 (Dkt. #54).

The only Defendants remaining in this lawsuit are FISD and the City; Defendants Frisco Police Department, Hoover, and Springer are no longer parties to this lawsuit (Dkt. #9; Dkt. #17; Dkt #47).  FISD's Motion to Dismiss (Dkt. #29), the City's Motion to Dismiss (Dkt. #40), Plaintiff's Motion to Lift the Stay (Dkt. #48), and City's Motion to Stay (Dkt. #49) are all fully briefed and ripe for consideration.

## LEGAL STANDARD

"To survive a motion to dismiss [pursuant to Federal Rule of Civil Procedure 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[5] A court generally may not "go outside the complaint" in

---

[5] To assess the sufficiency of a complaint, the court first identifies conclusory allegations and disregards them, for they are "not entitled to the assumption of truth," and then considers whether the remaining allegations "plausibly suggest an entitlement to relief." *Iqbal*, 556 U.S. at 681. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

considering a Rule 12(b)(6) motion but may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted); *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

## ANALYSIS

### FISD

Plaintiff raises several causes of action against FISD (Dkt. #17). Plaintiff's first cause of action alleges a violation of Title IX because "FISD's acts and failures to act perpetrated against [Plaintiff] amounted to unlawful sexual harassment and discrimination on the basis of sex." (Dkt. #17 at p. 24). Plaintiff brings this cause of action under two theories: (1) Heightened Risk; and (2) Pre-Assault and Post-Assault Deliberate Indifference (Dkt. #17 at pp. 24–26). FISD claims in its Motion to Dismiss that "Plaintiff cannot maintain her claim against [FISD] under Title IX." (Dkt. #29 at p. 7).

Plaintiff's second cause of action against FISD pertains to violations of her Fourteenth Amendment rights in violation of 42 U.S.C. § 1983 (Dkt. #17 at pp. 26–31). Specifically, Plaintiff alleges "FISD is liable under 42 U.S.C. § 1983 for violating [Plaintiff's] rights under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the United States Constitution." (Dkt. #17 at p. 26). The court now considers each cause of action, in turn.

### FISD'S ALLEGED TITLE IX VIOLATIONS

In relevant part, Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving

Federal Financial assistance."[6] 20 U.S.C. § 1681(a). The Supreme Court of the United States has "rejected the use of agency principles to impute liability to the [school] district for the misconduct of its teachers." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). Similarly, the Court has rejected a negligence standard, or "holding the [school] district liable for its failure to react to teacher-student harassment of which it knew or *should have known*." *Id.* (emphasis in original). Instead, school districts can only be held liable for damages "where the [school] district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge." *Id.* In considering whether a school district can be liable under a deliberate indifference theory, the school district "cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.* at 644. In other words, the party with actual knowledge who acts with deliberate indifference must have the authority to punish the wrongdoer and remedy the hostile environment. *See id.* at 645 ("These factors combine to limit a [Title IX funding] recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs"). "[A]ctual knowledge, means that the school must have actual, not constructive, knowledge of sexual harassment. Specifically, the school must have actual knowledge that harassment has occurred, is occurring, or that there is a substantial risk that sexual abuse would occur." *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (internal citations and quotation marks omitted).

---

[6] The parties do not dispute that FISD is a recipient of federal funds and, therefore, subject to the rules and regulations of Title IX.

### *Actual Knowledge or Knowledge of a Substantial Risk*

FISD contests that Plaintiff has established the first element of a Title IX violation: namely, whether FISD had actual knowledge of Hoover's abuse of Plaintiff, or whether FISD had knowledge of a substantial risk that Hoover would abuse Plaintiff (Dkt. #29 at pp. 18–25). Plaintiff, however, contends that "[o]ne or more FISD administrators or officials, with authority to take corrective action on [Plaintiff's] behalf, had actual notice of the sexual harassment that was occurring before Hoover's actions escalated to sexual assault but failed to adequately respond, in violation of their own policies." (Dkt. #17 at p. 25).

Plaintiff's Amended Complaint lays bare a plethora of factual allegations that individuals from FISD were aware of Hoover's behavior and preferable treatment of female students, as well as his position working with abused students (Dkt. #17 at pp. 13–16). FISD, for the purposes of its Motion to Dismiss, adopted Plaintiff's factual background (Dkt. #29 at p. 1).[7] While reserving its right to object to Plaintiff's factual allegations, FISD has not done so. Rather, FISD challenges whether Plaintiff has properly alleged that any appropriate official had actual knowledge of Hoover's abuse of Plaintiff.

Plaintiff's pleadings must stand on their own merit at this stage in the litigation. Indeed, Plaintiff's Response to FISD's Motion to Dismiss is before the court without the benefit of any discovery. Regardless, Plaintiff has alleged "that at least 11 persons—including Hoover's direct supervisor Chadd Springer, the lead program coordinator for the summer Junior Police Academy and school administrators—were aware [of] the substantial risk Hoover posed to female students in general and to [Plaintiff] specifically." (Dkt. #35 at pp. 11–12). Plaintiff alleges that the Principal of Staley Middle School, where Hoover served as an SRO, was aware of Hoover's

---

[7] "The factual allegations set forth herein are taken from Plaintiff's First Amended Complaint and are adopted solely for the purposes of the District's Motion to Dismiss." (Dkt. #29 at p. 7, n.1).

conduct on campus with female students (Dkt. #17 at p. 13). Additionally, Plaintiff has alleged that FISD officials were on site at the JPA (Dkt. #17 at p. 10). It is plausible, that through discovery, Plaintiff will learn that an appropriate official had actual knowledge of Hoover's hostile behavior toward female students, including Plaintiff. It is also plausible that Plaintiff could discover evidence that an appropriate FISD official had knowledge of a substantial risk of the abuse Plaintiff ultimately suffered. *Twombly*, 550 U.S. at 545 ("Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [liability].")

Plaintiff is not required to *prove* her case at the pleading stage. Rather, Plaintiff merely needs to allege factual allegations that it is plausible that she may recover based on her claims for relief. Many of the cases cited by FISD were decided at the summary judgment stage, after the benefit of discovery. For example, FISD cites to *Doe v. Northside I.S.D.*, 884 F. Supp. 2d 485 (W.D. Tex. 2012) for the proposition that the court found "no actual knowledge of abuse despite allegations that teacher had 'boundary' issues, hugged plaintiff, and gave chest bumps." (Dkt. #29 at p. 20, n.26). *Doe v. Northside I.S.D.* was decided on a full evidentiary record. Similarly, FISD relies on *K.B. v. Daleville City Bd. of Educ.*, No. 12–125518, 2013 WL 5422685, at *6 (11th Cir. Sept. 20, 2013), an out-of-circuit, unreported case—which was decided after the parties were able to engage in discovery—for the proposition that "allegations from students that school employee was continuously 'undressing them with his eyes' was insufficient notice" (Dkt. #29 at p. 20, n.26). The procedural posture for each of these cases is dissimilar to the instant lawsuit, which is at the motion to dismiss stage of litigation.

It is well-established in the Fifth Circuit that a "motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale*

*Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). Accepting Plaintiff's well-pleaded facts as true and liberally construing the Amended Complaint in favor of Plaintiff, the court finds that it would be improper to dismiss Plaintiff's Title IX claim for lack of actual notice by an appropriate person at this stage of the litigation. Plaintiff has pleaded that an appropriate person at school had knowledge of Hoover's behavior with students that put Plaintiff at a substantial risk of abuse through the 2021 JPA Program. It does not "appear[] beyond doubt that the plaintiff can prove no set of facts in support of [her] claim that would entitle [her] to relief." *Id.*

FISD contends that it is not enough that an appropriate school official have knowledge of a generalized risk, but that the appropriate "official must have actual knowledge of facts demonstrating a substantial risk of harm." (Dkt. #29 at p. 20).[8] For this proposition, FISD cites *Alegria v. Texas*, No. G-06-0212, 2007 WL 3256586, at *9 (S.D. Tex. Nov. 2, 2007). FISD also relies on *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 658 (5th Cir. 1997), which states that "a school district is not liable under Title IX for a teacher's sexual harassment unless it has actual notice of the harassment." 106 F.3d at 658. *Rosa H.*, however, also states that plaintiffs "need not show that the district knew that a particular teacher would abuse a particular student; the plaintiff could prevail in this case, for example, by establishing that the school district failed to act even though it knew that [a teacher] posed a substantial risk of harassing students in general." *Id.* at 659. Such is the case here. Plaintiff has alleged "[o]ne or more FISD administrators or officials, with authority to take corrective action on [Plaintiff's] behalf," had knowledge that she—and female students in general—was at a substantial risk of abuse by Hoover based on his actions at

---

[8] FISD also relies on *Reagans v. Grapeland Indep. Sch. Dist.*, No. 9:21-cv-00267, 2023 WL 1781802, at *4 (E.D. Tex. Feb. 6, 2023) for the proposition that while Hoover may have been grooming Plaintiff during the 2021 JPA Program, "[a]ny contact between an adult and a child could be grooming behavior, but that does not mean that all contact is sexual harassment under Title IX." (Dkt. #29 at pp. 21–22). *Reagans* is distinguishable, though, because it too, like much of FISD's authority, was decided on a full evidentiary record at the summary judgment stage.

Staley Middle School toward female students and the 2021 JPA Program toward Plaintiff (Dkt. #17 at p. 25).

FISD also draws the court's attention to *Davis* for its proposition that Title IX "recipients may be liable when they are deliberately indifferent to 'known acts' of sexual harassment." (Dkt. #29 at p. 20, n.22). In *Davis*, the Supreme Court ultimately reversed the dismissal of the plaintiffs' Title IX cause of action because "[t]he complaint also suggests that petitioner may be able to show both actual knowledge and deliberate indifference on the part of the Board, which made no effort whatsoever either to investigate or to put an end to the harassment." 526 U.S. at 654. Similarly, Plaintiff has alleged that numerous school officials, including the Staley Middle School principal, witnessed inappropriate behavior between Hoover and female students, including Plaintiff, and did nothing to correct such behavior (Dkt. #17 at p. 25).[9] As such, it is plausible that, based on the allegations in the Amended Complaint, Plaintiff may be able to establish actual knowledge of the sexual harassment or a substantial risk of sexual harassment on the part of an appropriate FISD official. Accordingly, taking Plaintiff's allegations as true and liberally construing the Amended Complaint, Plaintiff's Amended Complaint survives dismissal on the grounds of actual knowledge within the purview of her Title IX claim.

### *Pre-Assault and Post-Assault Deliberate Indifference*

Having determined that it is plausible that Plaintiff can establish that an appropriate FISD official had actual notice of Hoover's harassment or a substantial risk that Plaintiff would be

---

[9] FISD also notes the "opportunity to cure" requirement (Dkt. #29 at pp. 23–24) ("In other words, to hold Plaintiff's allegations regarding Officer Hoover's alleged sexual grooming provide the requisite actual notice that there was a substantial risk of harm to Plaintiff deprives Frisco ISD of the opportunity to comply with Title IX as it never received notice of a Title IX Violation in the first instance."). This point is moot, however, because the court has not found that Plaintiff has proven actual notice of a Title IX violation, but rather that she has alleged sufficient facts that it is plausible that an appropriate official may have had actual knowledge of a substantial risk of harm. Whether FISD had actual knowledge and an opportunity to cure are factors that will be borne out through discovery. FISD cites to *M.E. v. Alvin Indep. Sch. Dist.*, 840 F. App'x 773 (5th Cir. 2020) as being "instructive." *M.E.*, however, was decided on a motion for summary judgment. *Id.*

REPORT AND RECOMMENDATION – Page 17

subjected to Hoover's harassment, the court must now determine whether Plaintiff has plausibly alleged that FISD was deliberately indifferent. "If a [Title IX] funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Davis*, 526 U.S. at 644–45 (citing definitions of "subject" from Random House Dictionary of the English Language 1415 (1966) and Webster's Third New International Dictionary 2275 (1961)).

Plaintiff has alleged that one or more appropriate officials from FISD had actual notice of Hoover's harassment or a substantial risk of harassment of Plaintiff and failed to act in violation of FISD's policies, which resulted in "deliberate indifference toward the unlawful sexual conduct that had occurred, was occurring, or was likely to occur," and which ultimately resulted in Hoover's sexual assault of Plaintiff (Dkt. #17 at p. 25). Plaintiff alleges that, due to "FISD's deliberate indifference, [Plaintiff] was forced to endure a sexually hostile environment on campus and was made vulnerable to further harassment." (Dkt. #17 at p. 25). Thus, plaintiff has alleged that FISD's deliberate indifference caused her to undergo harassment or made her vulnerable to harassment, in accordance with *Davis. Id.* at 644–45.

FISD does not directly respond to this allegation from Plaintiff. Rather, FISD argues that Plaintiff's deliberate indifference claim should fail because an appropriate person did not have actual notice of the sexual harassment or actual notice of a substantial risk of harassment (Dkt. #29 at pp. 22, 25). Any other references to deliberate indifference regarding Plaintiff's first cause of action were included in footnote citations. FISD's argument is that because an appropriate person did not have actual notice of the harassment, Plaintiff cannot even reach the issue of deliberate indifference. However, as discussed, *supra*, the court finds that Plaintiff has alleged facts that make

it plausible that Plaintiff can establish that an appropriate person had actual notice, and, therefore, it is plausible, and Plaintiff has alleged sufficient facts, that Plaintiff can establish that FISD acted with deliberate indifference. Accordingly, Plaintiff's allegations of deliberate indifference survive FISD's Motion to Dismiss.

### Heightened Risk

It is unclear whether Plaintiff can maintain a pre-assault claim for a heightened risk of assault in the Fifth Circuit. A sister court, however, has recognized that a heightened risk claim may be viable because, "[w]hile the Fifth Circuit has not recognized as cognizable a Title IX claim for creation of a general heightened risk of discrimination, it has not foreclosed the possibility that such a claim may be cognizable in the context of student-on-student sexual assault." *Doe v. Texas A&M Univ.*, 634 F. Supp. 3d 365, 375 (S.D. Tex. 2002). The court takes guidance from *Doe v. Texas A&M* and a Ninth Circuit case, *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1112 (9th Cir. 2020), which states:

> a pre-assault claim should survive a motion to dismiss if the plaintiff plausibly alleges that (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the plaintiff of access to the educational opportunities or benefits provided by the school.

*Karasek*, 956 F.3d at 1112 (citing *Davis*, 526 U.S. 650) (cleaned up). *Karasek* clarifies that, "all [a plaintiff] need allege are facts demonstrating the four elements we have articulated above." 956 F.3d at 1113.

Here, Plaintiff has alleged that FISD maintained a policy to allow Hoover to work with the school counselor to advise troubled students (Dkt. #17 at p. 24). Plaintiff has also alleged that FISD acted with deliberate indifference to the behavior (sexual misconduct) Hoover exhibited around the female students at Staley Middle School (Dkt. #17 at pp. 24–25). Plaintiff then alleges

that such policy and deliberate indifference created a heightened risk of sexual harassment that was known to appropriate officials (Dkt. #17 at pp. 24–25). The alleged behavior occurred at Staley Middle School and during the 2021 JPA Program, which occurred on an FISD campus, and was thus subject to FISD's control (Dkt. #17 at p. 24). Finaly, it is unquestionable that Plaintiff suffered severe sexual harassment via Hoover's sexual assault of Plaintiff, which Plaintiff alleges deprived her of access to educational opportunities or benefits provided by the school (Dkt. #17 at p. 25).

FISD cites *Roe v. Cypress-Fairbanks ISD* for support that Plaintiff's heightened risk claim should be dismissed. Several distinctions can be drawn between *Roe v. Cypress-Fairbanks ISD* and the instant matter. *Roe v. Cypress-Fairbanks ISD* found that "assorted incidents of sexual misconduct involving neither the Title IX victim nor the aggressor are generally insufficient to give a school district actual knowledge of the plaintiff's assault." 53 F.4th at 342. Not only was *Roe v. Cypress-Fairbanks ISD* decided on summary judgment, but the present lawsuit alleges actual notice of Hoover's behavior with students at Staley Middle School and Plaintiff. Plaintiff has not alleged that other aggressors and other victims should have put the school on notice. Rather, she is alleging that it is Hoover's behavior with Plaintiff, and other students, that is at issue. Again, taking Plaintiff's well-pleaded allegations as true and liberally construing her Amended Complaint, to the extent Plaintiff can maintain a cause of action for a heightened risk of a Title IX violation, Plaintiff's claim survives FISD's Motion to Dismiss.[10]

**FISD'S ALLEGED § 1983 VIOLATIONS**

Plaintiff alleges that "[b]y its conduct, acting under color of state law through its administrators and its [SROs], FISD is liable under 42 U.S.C. § 1983 for violating [Plaintiff's]

---

[10] As the Fifth Circuit has not explicitly recognized a heightened risk cause of action under Title IX, the parties will need to brief this allegation in greater detail at the summary judgment stage.

rights under the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the United States Constitution." (Dkt. #17 at p. 26).

Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983

In *Collins v. Harker Heights*, the Supreme Court of the United States confirmed that "municipalities and other local government entities [are] included among those persons to whom § 1983 applies." 503 U.S. 115, 120 (1992) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "At the same time, the Court made it clear that municipalities may not be held liable 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.'" *Id.* at 120–21 (citing *Monell*, 436 U.S. at 691)).

As an initial matter, FISD claims that "Plaintiff's factual allegations fail to state a violation of her constitutional rights." (Dkt. #29). The court disagrees. Plaintiff was sexually assaulted by Hoover, who was, at the time, employed as an SRO with FISD and an on-duty police officer with the City. Therefore, Plaintiff has established that she suffered a violation of her constitutional rights. *See Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 451 (5th Cir. 1994) ("If the Constitution protects a schoolchild against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a schoolchild from physical sexual abuse—here, sexually fondling a 15-year-old school girl and statutory rape—by a public schoolteacher."). Thus, the remaining question is

whether Plaintiff has pleaded sufficient facts that it is plausible that FISD may be liable for such violations through its policies or customs.

### *Equal Protection*

The court now turns to Plaintiff's equal protection claim. Plaintiff alleges that "[t]he moving force behind the sexually harassing and abusive acts toward Plaintiff—which were violative of constitutional rights to personal security, bodily integrity, and equal protection—were the policies, customs, and/or widespread practices of FISD and FISD's deliberate indifference to prior and ongoing risks of sexually inappropriate conduct by educator, employees, and SROs, including Hoover." (Dkt. #17 at pp. 26–27). Incorporated by reference in Plaintiff's Amended Complaint are at least eight reported arrests of men employed by FISD, including six FISD employees and two FISD SROs, that occurred between 2014 and 2023 (Dkt. #17 at pp. 11–13). It is Plaintiff's contention that "FISD established and maintained customs, policies, and/or practices that were deliberately indifferent to the risk and actual occurrence of sexually inappropriate conduct directed toward vulnerable female students." (Dkt. #17 at p. 27).

While it may not be probable that FISD enacted such policies "willfully, knowingly, and with specific intent to deprive [Plaintiff] of her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution" as Plaintiff so alleges, Rule 12(b)(6) does not impose a probability standard upon Plaintiff's Amended Complaint. *See* FED. R. CIV. P. 12(b)(6). Rather, Plaintiff's burden is to establish that her allegations are plausible.

Plaintiff has pleaded a plausible right to relief, for example, due to FISD's "express policy of placing SRO's [*sic*] in a position of trust, using SROs as 'counselors' and encouraging SROs to develop close personal relationships working one-on-one with female students experiencing 'personal problems.'" (Dkt. #17 at p. 27). Such relief is plausible because, as Plaintiff alleges,

FISD's policy is "[c]ontrary to Texas Education Code Section 37.081(d-2), which prohibits school districts from assigning duties to school resource officers that include 'contact with students unrelated to law enforcement duties." (Dkt. #17 at p. 27) (citing TEX. EDUC. CODE § 37.081(d-2)). Without the benefit of discovery, Plaintiff likely does not have the evidence she needs to prove this claim. However, accepting Plaintiff's well-pleaded allegations as true, it is plausible that after written discovery requests and depositions occur, Plaintiff may be able to establish that FISD did, in fact, willfully, knowingly, and intentionally enact policies that were violative of students' constitutional rights, especially in light of the alleged policy being in violation of the Texas Education Code. Accordingly, Plaintiff's equal protection claims survive FISD's motion to dismiss.

### *Due Process*

Plaintiff's Amended Complaint states:

> Plaintiff alleges that [FISD] deprived Plaintiff [] of her substantive due process rights in contravention of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 by failing to fashion properly or execute faithfully adequate policies to recognize, investigate, record, prevent and report inappropriate behavior by SROs, and instead allowing the development and adherence to customs and/or practices [that] were the moving force behind the injuries suffered by Plaintiff.

(Dkt. #17 at p. 30). Plaintiff then provides a non-exhaustive list of eight ways in which FISD contributed to Plaintiff's deprivation of her substantive due process rights:

a. Adopting the express policy of placing SRO's [*sic*] in a position of trust, using SROs as "counselors" and encouraging SROs to develop close relationships working one-on-one with female students experiencing "personal problems."
b. Ignoring or discounting complaints and information indicating inappropriate "grooming" or sexual behavior by SROs or other staff toward students.
c. Hiring, maintaining, and/or assigning SROs or other staff with disregard for information indicating prior inappropriate behaviors towards FISD students.
d. Not documenting complaints of inappropriate conduct by SROs or other staff.
e. Not conducting sufficient investigations or following up on signs of inappropriate sexually based behavior between SROs or other staff and FISD students.

     f.  Maintaining a tolerance for inappropriate behaviors between SROs or other staff and FISD students which in turn emboldened other adults, including Hoover.

     g.  Failing to train and supervise teachers, SROs, and other staff adequately concerning their interaction with FISD students.

     h.  Failing to train employees to recognize, identify, prevent, investigate and stop inappropriate conduct by educators, including SROs, toward students, including but not limited to grooming and inappropriate relationships.

(Dkt. #17 at pp. 30–31).

The Fifth Circuit recognizes that the Fourteenth Amendment protects students' substantive due process rights to bodily integrity. *Doe v. Beaumont Indep. Sch. Dist.*, 615 F. Supp. 3d 471, 486–90 (E.D. Tex. 2022) (collecting cases). However, courts in the Fifth Circuit have grappled with the amount and type of physical contact required to violate a student's right to bodily integrity. *Id.* at 486–87. "The Fifth Circuit's substantive due process jurisprudence on the deprivation of the right to bodily integrity can sometimes cause harsh results at the district court level. This was not always so." *Id.* at 486. The *Doe v. Beaumont ISD* court recognized that courts in the Fifth Circuit have pulled away from the Fifth Circuit's decision in *Doe v. Taylor ISD*, which stated: "If the Constitution protects a schoolchild against being tied to a chair or against arbitrary paddlings, then surely the Constitution protects a schoolchild from physical sexual abuse—here, sexually fondling a 15-year-old school girl and statutory rape—by a public schoolteacher." *Doe v. Taylor ISD*, 15 F.3d at 451. "But subsequently, the further that abusive behavior has strayed from sexual assault— with *penetration*—and has instead involved inappropriate or unwanted fondling, rubbing, or touching, the more difficulty district courts in the Fifth Circuit have had recognizing deprivations of the substantive due process right to bodily integrity." *Doe v. Beaumont ISD*, 615 F. Supp. 3d at 487 (emphasis in original).

Here, FISD does not directly dispute Plaintiff's allegation that FISD is liable for violations of her substantive due process right to personal safety, security, and bodily integrity. In fact, the

only mention of personal safety, security, or bodily integrity in FISD's Motion to Dismiss is its Statement of Issues (Dkt. #29 at p. 7) ("3. Plaintiff cannot maintain her constitutional claims against [FISD] for personal security, bodily integrity, and equal protection given the lack of municipal liability."). FISD assumes "*arguendo* that Plaintiff pleaded a viable violation of her constitutional rights." (Dkt. #29 at p. 20). FISD rests its denial of liability on Plaintiff's failure to establish municipal liability (Dkt. #29 at pp. 7, 26–29).

Given that Plaintiff has established a violation of her constitutional rights, FISD's argument, then, is that Plaintiff failed to "plead facts identifying a policy or custom adopted by the Frisco ISD Board of Trustees with deliberate indifference that was the moving force behind the alleged violations of Plaintiff's constitutional rights." (Dkt. #29 at p. 27). In other words, an official policy—which is a policy that has been officially adopted by the municipality or a custom that is so widespread as to represent an official policy—must be the moving force behind Plaintiff's injury (Dkt. #29 at p. 27) (citing *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)). FISD asserts "[t]here is simply no connection between the alleged policy regarding SROs serving in a limited role as counselors and the alleged violation of Plaintiff's constitutional rights." (Dkt. #29 at p. 28). FISD makes this assertion because Hoover was participating in the 2021 JPA Program that was run by the City, and Plaintiff did not attend Staley Middle School where Hoover was assigned to serve as an SRO (Dkt. #29 at p. 28).

The court finds, however, that Plaintiff has alleged a connection. For example, Plaintiff alleges that it was FISD's policy to put SROs in positions beyond providing security. More specifically, Plaintiff alleges that SROs, including Hoover, served as pseudo-counselors for troubled students (Dkt. #17 at p. 30). Plaintiff has also alleged that Hoover had a history of connecting with female students, allowing female students to "hang out" in his office, and causing

female students to be tardy to their classes (Dkt. #17 at pp. 13–14). Additionally, Plaintiff has alleged that the 2021 JPA program took place on an FISD campus and that FISD officials were on site during the program (Dkt. #17 at pp. 10, 14). Plaintiff argues that allowing Hoover's interactions with female students to go unchecked culminated in Hoover's sexual assault of Plaintiff (Dkt. #17 at pp. 29–31).

It is clear from the face of Plaintiff's Amended Complaint that she alleged FISD failed to implement, maintain, or exercise proper policies for reporting inappropriate behavior between employees and students (Dkt. #17 at p. 29–31). Due to this alleged failure on the part of FISD, Plaintiff alleges Hoover was permitted to continue such behavior with Plaintiff on an FISD campus during the 2021 JPA Program, culminating in multiple instances of sexual assault. Such actions resulted in the alleged violation of Plaintiff's substantive due process rights to "personal safety, security, and bodily integrity." (Dkt. #17 at pp. 29–31; Dkt. #35 at pp. 21–23). Accordingly, Plaintiff's substantive due process rights claim survives FISD's Motion to Dismiss.

### *Failure to Train or Supervise*

Plaintiff alleges that both her constitutional violations, equal protection and substantive due process, are based, in part, on a theory of failure to train or supervise (Dkt. #17 at pp. 27–31). Broadly, Plaintiff claims that "FISD's decision not to train or supervise its employees about their legal duty to avoid violating students' constitutional rights rises to the level of an official policy under Section 1983." (Dkt. #17 at p. 28). Plaintiff also alleges that "[t]o the extent FISD provided any training and supervision, the training and supervision was inadequate." (Dkt. #17 at p. 28). Plaintiff further alleges that "[t]he risk of a constitutional violation was or should have been obvious or a highly predictable consequence of the training inadequacies." (Dkt. #17 at p. 28).

FISD argues that "Plaintiff also asserts [FISD] failed to train and supervise its staff, albeit without any supporting allegations." (Dkt. #29 at p. 28). As noted by FISD, the standard for municipal liability for an employee's violations of a citizen's constitutional rights based on a theory of failure to train or supervise is set out in *Connick v. Thompson*, 563 U.S. 51 (2011).

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's liability is at its most tenuous where a claim turns on a failure to train. To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact. Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.

> [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.

> A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the deliberate indifference—necessary to trigger municipal liability.

*Id.* at 61–62 (internal citations and quotation marks omitted).

*Connick* involved a series of *Brady* violations. *Id.* at 62. The Supreme Court of the United States noted that four convictions had been reversed due to *Brady* violations in Louisiana courts, and "[t]hose four reversals could not have put Connick on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here." *Id.* That is, none of the four reversals involved the same type of *Brady* violation alleged by the defendant. *Id.* at 62–63.

REPORT AND RECOMMENDATION – Page 27

*Connick* is easily distinguishable. *Connick* involved four instances over ten years across Louisiana courts. Here, Plaintiff alleges that eight arrests in nine years from a single school district is illustrative of FISD's failure to train or supervise (*See generally* Dkt. #17). In the instant lawsuit, the municipality is more localized, the time frame is shorter, and the number of instances is doubled. It is plausible that nearly one arrest of an FISD employee or SRO per year for sexual harassment of a student is sufficient to put FISD on notice that its policies or customs are inadequate. Such actual or constructive notice, but adherence to the same policies, may amount to FISD's deliberate indifference.

Although FISD argues that Plaintiff did not provide any supporting allegations, Plaintiff did, in fact, include at least four allegations of FISD's failure to train or supervise with respect to her equal protection claim, (Dkt. #17 at pp. 28–29), and at least two allegations of FISD's failure to train or supervise with respect to her substantive due process claims (Dkt. #17 at pp. 29–31). It is Plaintiff's contention that FISD's employees' and SROs' sexual harassment of FISD students was a direct consequence of these precise failures to train or supervise. Accordingly, the court finds that Plaintiff has alleged sufficient facts to plausibly state a claim that FISD is liable under a failure to train or supervise theory. Thus, FISD's Motion to Dismiss is denied on this matter and in its entirety.

<u>**THE CITY**</u>

**THE CITY'S ALLEGED § 1983 VIOLATIONS**

Plaintiff has also alleged various § 1983 violations against the City (Dkt. #17 at pp. 31–36). The City has moved to dismiss Plaintiff's Amended Complaint on Federal Rule of Civil Procedure 12(b)(6) grounds (Dkt. #40).

REPORT AND RECOMMENDATION – Page 28

As discussed, *supra*, § 1983 serves to prohibit a person acting under color of law from violating citizens' constitutional rights. 42 U.S.C. § 1983. Governmental entities are considered persons under § 1983, but the entities may only be liable when their policies or customs are the cause of the constitutional violation. *Collins*, 503 U.S. at 120–21. A custom is a pattern "so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

Plaintiff alleges that "[t]he City entered into an agreement with FISD that provided that Frisco PD officers would serve as SROs performing duties contrary to Texas Education Code Section 37.081(d-2)." (Dkt. #17 at p. 32). Plaintiff argues that the City placed SROs in "a position of trust" and that SROs "serve as 'counselors' who were expected to develop close relationships working one-on-one with female students experiencing 'personal problems.'" (Dkt. #17 at p. 32). Plaintiff further alleges that the City failed to "train or supervise its SROs about their legal duty to avoid violating students' constitutional rights," which "rises to the level of an official policy under Section 1983." (Dkt. #17 at p. 32). It is Plaintiff's contention that "any training and supervision" that the City did provide "was inadequate" and that "[t]he risk of a constitutional violation was or should have been obvious or a highly predictable consequence of the training inadequacies." (Dkt. #17 at p. 32).

The City argues that Plaintiff has not met the "threshold plausibility requirements, particularly given the applicable deliberate indifference standard as well as *Monell*'s moving force causation requirement." (Dkt. #40 at p. 2). Specifically, the City challenges:

1.   Whether Plaintiff has plead any plausible Section 1983 claim because former Officer Hoover was not acting under "color of law" when he sexually assaulted Plaintiff;
2.   Whether Plaintiff has plead any plausible Section 1983 or *Monell* claims;
3.   Whether Plaintiff has plead any plausible Failure to Train/Supervise claims;
4.   Whether Plaintiff has plead any plausible Equal Protection claim;
5.   Whether Plaintiff has plead any plausible Substantive Due Process claim;

6.     Whether Plaintiff has plead any claims which overcome Chadd Springer's entitlement to Qualified Immunity; and

7.     Whether Plaintiff can recover punitive damages from Chadd Springer.[11]

(Dkt. #40 at p. 2).

### *Hoover Was Acting Under "Color Of Law"*

As the City notes, to state a claim for a § 1983 violation, Plaintiff "must (1) allege a violation of a right secured by the constitution (2) that was committed by a person acting under color of law. (Dkt. #40 at p. 8) (citing *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008)). As discussed, *supra*, Plaintiff has pleaded sufficient facts that Hoover violated Plaintiff's constitutional right to personal safety, security, and bodily integrity. The City essentially claims as much in stating that "[i]t is th[e] second prong where Plaintiff clearly fails - Hoover was not acting under color of state law [nor certainly in his capacity as a City of Frisco Peace Officer] when he engaged in illicit sexual activities with [Plaintiff] in July and August of 2021." (Dkt. #40 at p. 9).

"[A] defendant acts under color of state law if he 'misuses or abuses his official power' and if 'there is a nexus between the victim, the improper conduct, and [the defendant's] performance of official duties.'" *Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002) (quoting *United States v. Causey*, 185 F.3d 407, 415 (5th Cir. 1999)) (alteration in original). "'If, [however,] a state officer pursues personal objectives without using or misusing the power granted to him by the state to achieve the personal aim, then he is not acting under color of state law.'" *Id.* (quoting *Harris v. Rhodes*, 94 F.3d 196, 197 (5th Cir. 1996)) (alternation in original).

The City contends Hoover was not acting under color of state law because the instances of sexual assault "did not occur at any school facility owned, staffed and/or operated by the City of Frisco." (Dkt. #40 at p. 9). The City also asserts that Hoover's actions "were in no way part of

---

[11] The court notes that Plaintiff removed all claims against Defendant Chadd Springer on August 20, 2024 (Dkt. #47). Accordingly, the court does not consider the City's arguments in its Motion to Dismiss with regard to Springer.

Hoover's duties as a School Resource Officer, were certainly not City of Frisco sponsored, nor reported to any City of Frisco official." (Dkt. #40 at p. 9). The City's arguments are unpersuasive.

Plaintiff specifically alleges that Hoover misused or abused his official power in at least the following ways:

1. Hoover's relationship with Plaintiff grew out of his role as an SRO in JPA, a legitimate police activity;
2. Hoover took advantage of his position of authority as an SRO at JPA;
3. Hoover used the authority of his position by telling Plaintiff he ran her license plates and knew where she parked her car;
4. Hoover used the authority of his position by telling Plaintiff that he would use truth serum on her if he had to;
5. Hoover coerced Plaintiff into complying by referencing he had his gun;
6. Hoover gave the implicit threat that he would never be held accountable because he could pass a lie detector test; and
7. Hoover was on duty during each instance of sexual misconduct.

(Dkt. #42 at p. 14; *see also* Dkt. # 17 at pp. 20–23). Tellingly, during each of the instances of sexual assault, Hoover was on duty, wore "a cop shirt," had a gun, and turned off his work phone to avoid being tracked (Dkt. #17 at pp. 20–23). Plaintiff repeatedly alleges that her fear of Hoover's position of authority as a police officer led to her compliance during the instances of sexual assault (Dkt. #17 at pp. 20–23).

At this stage of the litigation, the court must take Plaintiff's well-pleaded allegations as true and construe the allegations in the light most favorable to Plaintiff. Accordingly, the court finds that Plaintiff has sufficiently alleged that Hoover misused or abused his official power during and after the 2021 JPA Program, and Plaintiff has alleged a nexus between herself, Hoover's improper conduct, and the performance of Hoover's official duties: *i.e.*, Hoover was acting under color of law. The City's Motion to Dismiss is denied in this respect.

### *Plaintiff Has Pleaded Plausible § 1983 Claims*

The City argues that "Plaintiff has not properly plead nor could she establish Section 1983 and *Monell* liability nor does she meet the governing deliberate indifference standard." (Dkt. #40

REPORT AND RECOMMENDATION – Page 31

at p. 10). Plaintiff, on the other hand, claims that she has "allege[d] facts sufficient to support a plausible claim that the City maintained policies, practices, and/or customs that violated her constitutional rights." (Dkt. #42 at p. 19).

As discussed, *supra*, to state a claim for § 1983 violations, under *Monell*, Plaintiff must establish that the City maintained policies, customs, or practices that were the moving force behind the violation of her constitutional rights. *See Monell*, 436 U.S. at 691 ("On the other hand, the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.").

The City does not dispute that Plaintiff's constitutional rights were violated by Hoover (Dkt. #40 at p. 1) ("It is indeed reprehensible—and felonious—that Hoover had sexual relations with minor [Plaintiff]. Hoover has now plead guilty to his multiple crimes."). Thus, the City only challenges whether (1) the City maintained a policy or custom (2) that was the moving force behind the constitutional violations.

The City cites *Hall v. Robinson*, 618 F. App'x 759 (5th Cir 2015) for its position. The City notes "the 'high standard of proof' which is required before imposing municipal liability." (Dkt. #40 at p. 11) (quoting *Hall*, 618 F. App'x at 763). The City's reliance on *Hall* is misplaced. *Hall* was decided on a full evidentiary record at the summary judgment stage. Indeed, the quotation the City utilizes stands for the proposition that to impose liability requires proof—or discovery—a critical stage of litigation the parties have not begun.

Much as she has done with respect to FISD, Plaintiff has sufficiently alleged that the City, "through its policymakers, including but not limited to its Chief of Police," is liable under § 1983 due to the equal protection and substantive due process violations Plaintiff suffered (Dkt. #17 at

pp. 31–32). Plaintiff alleges that "[t]he moving force behind the sexually harassing and abusive acts toward Plaintiff . . . were the policies, customs and/or widespread practices of the City and the City's deliberate indifference to prior and ongoing risks of sexually inappropriate conduct by SROs." (Dkt. #17 at p. 32). Plaintiff specifically alleges a policy of the City to put SROs in "a position of trust" where they "serve as 'counselors' who were expected to develop close relationships working one-on-one with female students experiencing 'personal problems.'" (Dkt. #17 at p. 32). Such policy, as Plaintiff alleges, is in violation of Texas Education Code § 37.081(d-2).

Plaintiff has not been afforded the benefit of discovery. However, the court finds that she has gone beyond a mere boilerplate recitation of the elements of the causes of action. She has alleged a specific policy, alleged a specific policy maker, and alleged numerous facts to support her allegations, including Hoover serving in a position as a pseudo-counselor at Staley Middle School, SROs not reporting the behavior they witnessed at the 2021 JPA Program, and that the policies or customs of the City led to the violation of her constitutional rights. Indeed, it is Plaintiff's contention that the fact that none of the SROs felt the need to report the alleged grooming behavior they witnessed at the 2021 JPA Program is indicative of the policy or custom that led to the violations of her constitutional rights and establishes the City's deliberate indifference (Dkt. #17 at p. 32; Dkt. #42 at p. 27). The "heightened standard of proof" referenced by the City does not lead to the heightened pleading standard the City tries to impose on Plaintiff. At this stage in the litigation, Plaintiff has plausibly alleged a § 1983 violation.

### *Plaintiff Has Pleaded Plausible Failure to Train or Supervise Claims*

As with FISD, Plaintiff has alleged that the City violated both her constitutional rights of equal protection and substantive due process based, in part, on a theory of failure to train or

supervise (Dkt. #17 at p. 31–36). Overall, Plaintiff alleges that the City decided "not to train or supervise its SROs about their legal duty to avoid violating students' constitutional rights," which "rises to the level of an official policy under § 1983." (Dkt. #17 at p. 32). Plaintiff alleges that any training and supervision that the City may have provided "was inadequate." (Dkt. #17 at p. 32). It is Plaintiff's contention that "[t]he risk of a constitutional violation was or should have been obvious or a highly predictable consequence of the training inadequacies." (Dkt. #17 at p. 32).

The City argues that "Plaintiff has not properly plead nor can she establish any claims for failure to train or failure to supervise." (Dkt. #40 at p. 20).[12] As set out, *supra*, *Connick*, states that "[t]o satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." 563 U.S. at 61. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* Thus, as *Connick* confirms, Plaintiff must establish a claim of failure to train with "proof." As the court has made clear, Plaintiff has been unable to engage in discovery, and thus, has been unable to seek the "proof" required to establish her failure to train claim.

It is not Plaintiff's burden to prove her assertions at this stage. She must merely plead allegations that plausibly entitle her to a claim for relief. She has done so. At this point, Plaintiff must allege that "1) the [defendant] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the

---

[12] The City breaks failure to train and failure to supervise into two different standards, (Dkt. #40 at pp. 20–21), but that is unnecessary. *See Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) ("To succeed on his claim of failure to train or supervise, [plaintiff] must demonstrate that "1) the [defendant] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights."). Accordingly, the court takes up the failure to train or supervise together.

plaintiff's constitutional rights." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001) (citations omitted). Plaintiff, for example, has alleged that (1) the City failed "to train or supervise its SROs about their legal duty to avoid violating students' constitutional rights"; (2) that such failure to train or supervise is directly related to the multiple SROs observing grooming behavior and not reporting it"; (3) which led to a "deliberate indifference to prior and ongoing risks of sexually inappropriate conduct by SROs, including Hoover." (Dkt. #17 at pp. 32–35; Dkt. #42 at pp. 28–30).  After engaging in discovery, the trier of fact will determine whether Plaintiff has the "proof" necessary to succeed on such claims. Accordingly, Plaintiff's failure to train or supervise allegations survive the City's Motion to Dismiss.

### *Plaintiff's Equal Protection Claims*

As Plaintiff points out, and the City's Motion to Dismiss illustrates, Defendant has not directly challenged Plaintiff's equal protection claim beyond listing a single issue in that regard. The City states, "Defendant requests the Court decide the following issues:  . . . Whether Plaintiff has plead any plausible Equal Protection claim." (Dkt. #40 at p. 2). Because the City has not directly provided any argument or authority why Plaintiff's equal protection claim should be dismissed, the court need not address the same.[13]

### *Plaintiff Has Pleaded Plausible Substantive Due Process Claims*

Plaintiff's Amended Complaint states:

Plaintiff alleges that the City deprived her of her substantive due process rights in contravention of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983 by failing to fashion properly or execute faithfully adequate policies to recognize, investigate, record, prevent and report inappropriate behavior by SROs, and instead allowing the development and adherence to customs

---

[13] The City argues in its Reply that Plaintiff's "claims for Equal Protection must be brought under § 1983, a matter which was exhaustively briefed in Defendant's Motion to Dismiss." (Dkt. 44# at p. 7). As discussed, *supra*, Plaintiff's § 1983 claim survives the City's Motion to Dismiss, and therefore, Plaintiff's equal protection claim survives as well.

and/or practices [that] were the moving force behind the injuries suffered by
Plaintiff.

(Dkt. #17 at pp. 34–35). Plaintiff then provides a non-exhaustive list of nine ways in which the

City contributed to Plaintiff's deprivation of her substantive due process rights:

a.  Implementing a policy of assigning SROs to serve as counselors to vulnerable
    students with personal and family problems.
b.  Failing to train SROs regarding appropriate professional interactions with
    students, including but not limited to establishing and enforcing personal
    boundaries.
c.  Ignoring or discounting complaints and information indicating inappropriate
    "grooming" or sexual behavior by SROs or other staff toward students.
d.  Hiring, maintaining, and/or assigning SROs with disregard for information
    indicating prior inappropriate behaviors towards FISD students.
e.  Not documenting complaints of inappropriate conduct by SROs or other staff.
f.  Not conducting sufficient investigations or following up on signs of
    inappropriate sexually based behavior between SROs or other staff and FISD
    students.
g.  Maintaining a tolerance for inappropriate behaviors between SROs and FISD
    students which in turn emboldened other adults, including Hoover.
h.  Failing to train and supervise SROs adequately concerning their interaction
    with FISD students.
i.  Failing to train employees to recognize, identify, prevent, investigate and stop
    inappropriate conduct by SROs, toward students, including but not limited to
    grooming and inappropriate relationships.

(Dkt. #17 at p. 35).

As discussed, *supra*, Plaintiff has pleaded sufficient facts that Hoover violated her

constitutional right to personal safety, security, and bodily integrity. And as illustrated by the above

excerpts from Plaintiff's Amended Complaint, she has alleged several policies or customs that

were allegedly the moving force behind the constitutional violations. Furthermore, Plaintiff has

alleged numerous detailed instances of allegedly inappropriate behavior exhibited by Hoover as

he groomed Plaintiff that were witnessed by, but ignored by, several City police officers.

Defendant says it would take "an enormous [and legally impermissible] leap to connect

Hoover and Plaintiff[] 'eating breakfast and lunch together multiple times,' hanging out with each

other' during the week of July 19–22, 2021 and st[anding] 'uncomfortably close to each other' in

REPORT AND RECOMMENDATION – Page 36

the Summer of 2021 . . . to the later sexual encounters . . . ." (Dkt. #40 at p. 18). Whether intentional or not, the City has omitted Plaintiff's allegations that a City police officer knew that Plaintiff had Hoover's personal cell phone number, that Hoover and Plaintiff made physical contact on multiple occasions during the 2021 JPA Program (for example, leaning on one another and massaging shoulders), or that a police officer found Hoover and Plaintiff behind a locked door during the 2021 JPA Program (Dkt. #17 at pp. 13–20).

Ultimately, the City argues that multiple law enforcement officers witnessed the alleged grooming behavior and did not feel the need to report (Dkt. #40 at p. 19) ("Yet, Plaintiff is unable to show even one interaction that trained personnel felt was inappropriate enough to report . . . ."). Plaintiff's argument is the opposite side of the same coin (Dkt. #40 at p. 20) ("For weeks during the summer of 2021, at least seven SROs saw Plaintiff and Hoover engaged in inappropriate behavior on a daily basis. Yet, no action was taken to stop Hoover."). At this stage, it is Plaintiff's allegations that are to be taken as true and construed in the light most favorable to her. Accordingly, it is plausible that Plaintiff has alleged violations of her substantive due process rights, and her claims survive the City's Motion to Dismiss.

## CONCLUSION

Based on the foregoing, the court finds that Defendant FISD's Motion to Dismiss (Dkt. #29) should be denied and Defendants City and Springer's Corrected Motion to Dismiss (Dkt. #40) should be denied.

It is therefore **ORDERED** that FISD's Motion to Dismiss (Dkt. #29) is **DENIED** and the City's Corrected Motion to Dismiss (Dkt. #40) is **DENIED**. It is further **ORDERED** that the City's original Motion to Dismiss (Dkt. #38) is **DENIED AS MOOT**. It is further **ORDERED** that Plaintiff's Motion to Lift Stay and for Entry of Order Governing Proceedings (Dkt. #48) is

**GRANTED**. It is finally **ORDERED** that the City's Motion to Stay Discovery and Abatement of Order for Rule 26 Conference Pending Determination of Motion to Dismiss (Dkt. #49) is **DENIED** as moot.

**IT IS SO ORDERED.**

**SIGNED this 30th day of September, 2024.**

AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE