**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JANE DOE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:23-CV-00768-AGD |
| | § | |
| FRISCO INDEPENDENT SCHOOL DISTRICT, et al., | § | |
| | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is Defendant City of Frisco, Texas's ("City") Motion for Summary Judgment (Dkt. #91) and Defendant Frisco Independent School District's ("FISD") Motion for Summary Judgment (Dkt. #94). Having reviewed the respective Motions for Summary Judgment, Responses, Replies, Sur-Replies, and all other relevant pleadings, the court finds that Defendant City's Motion for Summary Judgment (Dkt. #91) should be granted, and Defendant FISD's Motion for Summary Judgment (Dkt. #94) should be granted. The court also finds that Plaintiff's Objections and Motion to Strike FISD's Summary Judgment Evidence (Dkt. #100) should be denied.

**PLAINTIFF'S OBJECTIONS**

As a threshold matter, the court addresses Plaintiff's Objections and Motion to Strike Frisco Independent School District's Summary Judgment Evidence (Dkt. #100). In response to FISD's Motion for Summary Judgment, Plaintiff objects to the inclusion of certain summary judgment evidence because FISD does not specifically reference each individual page of exhibits (Dkt. #100 at pp. 2–4). As support, Plaintiff cites Federal Rule of Evidence 401 and Local Rule CV-56.

As presented to the court, FISD's Motion for Summary Judgment includes more than 700 pages of exhibits, portions of which are not specifically referenced in the Motion for Summary Judgment. However, Plaintiff's Response in Opposition to FISD's Motion for Summary Judgment, (Dkt. #101), includes a set of exhibits as voluminous without referencing every page. Regardless, there is no requirement for parties to reference each page of their exhibits.

Rather than present any legal argument for the basis to strike large portions of FISD's summary judgment evidence under Federal Rule of Evidence 401, Plaintiff simply claims the evidence is irrelevant because it was not directly cited. While the Local Rules state that "[o]nly relevant, cited-to excerpts of evidentiary materials should be attached to the motion or the response," LOCAL R. CV-56(d), Plaintiff's request to strike uncited excerpts is an extreme remedy that Plaintiff asks this court to apply to only one party. In reviewing Plaintiff's objections, FISD's response, and all relevant pleadings, the court finds that Plaintiff's Objections and Motion to Strike FISD's Summary Judgment Evidence (Dkt. #100) should be and hereby is **DENIED**.

## BACKGROUND

***School Resource Officer Program***

At all times relevant to this matter, the City and FISD entered into a Memorandum of Understanding ("MOU") whereby the City provided police officers to serve as on-campus School Resource Officers ("SRO") for each of FISD's "secondary campuses" and, "[w]hen a need arises for an SRO at an elementary campus, SRO's [*sic*] . . . use the same feeder pattern as the school district . . . ." (Dkt. #97, Exhibit 1 at pp. 1–9). The relevant 2020–2021 MOU states:

> CITY is and at all times shall be deemed to be an independent contractor and shall be wholly responsible for the manner in which the [SRO] is assigned . . . , and the way CITY performs the services required by the terms of this [MOU]. Nothing herein shall be construed as creating the relationship of employer and employee, or principal and agent, between FISD and CITY or any of CITY's agents or employees. CITY assumes exclusive responsibility for the acts of its employees as

> they relate to the services provided during the course and scope of their employment. CITY, its agents and employees, . . . shall not be considered in any manner to be FISD employees.

(Dkt. #97, Exhibit 1 at p. 2).

Regarding a chain of command, SROs "report directly to an SRO Sergeant, who in turn reports to Police Administration, regarding all matters pertinent to their position and function." (Dkt. #97, Exhibit 1 at p. 6). SROs must also "[k]eep school administration/office staff informed when off-campus." (Dkt. #97, Exhibit 1 at p. 7).

The MOU's stated "primary purpose" is "the reduction and prevention of crime committed by juveniles and young adults." (Dkt. #97, Exhibit 1 at p. 5). The City and FISD agreed that "this purpose" would be accomplished "by achieving the established goals and objectives." (Dkt. #97, Exhibit 1 at p. 5). One particular goal was to "[e]stablish rapport with the students." (Dkt. #97, Exhibit 1 at p. 5). The MOU further set a responsibility of the SROs to "[p]rovide limited counseling to students with personal problems" and to "[c]ounsel with parents and staff as necessary." (Dkt. #97, Exhibit 1 at p. 6). In that regard, the MOU stated that "SRO's [*sic*] are not intended to replace any school counselor nor are they to conduct or offer any formal psychological counseling." (Dkt. #97, Exhibit 1 at p. 8).

During the school year, SROs were to "work school hours Monday through Friday." (Dkt. #97, Exhibit 1 at p. 8). SROs were also expected to "accomplish as much of the required training as possible during the summer months when school is not in session." (Dkt. #97, Exhibit 1 at p. 9). The MOU further provided that SROs "may still be involved in some summer projects with the school district. However, they will probably spend the majority of this time on police department assignments." (Dkt. #97, Exhibit 1 at p. 9). One such police department assignment, as relevant here, was the Junior Police Academy.

***Junior Police Academy***

The Junior Police Academy ("JPA") is a program that the City runs each summer for sixth and seventh grade students who live in Frisco or attend FISD schools (Dkt. #104 at p. 16). SROs staff the JPA, and the program is held on alternating FISD middle school campuses (Dkt. #104 at p. 16). The JPA is a free program where the City "offers young people the opportunity to experience law enforcement firsthand." (Dkt. #104, Exhibit 10 at p. 2). The City's website states that the JPA "transforms the traditional role of police officer into one of mentor and friend." (Dkt. #104, Exhibit 10 at p. 3). JPA is several four-day sessions that accommodate over 400 students per summer (Dkt. #104, Exhibit 10 at pp. 3, 13). At the JPA, participants, a.k.a. "cadets," learn about law enforcement topics (Dkt. #91 at p. 9). After being a cadet, students may return in the following years to serve as student volunteers (Dkt. #91 at p. 9).

***John Hoover***

On September 19, 2011, the City hired John Hoover ("Hoover") as a police officer until his termination on August 11, 2021 (Dkt. #91 at p. 3). As relevant here, Hoover began to serve as an SRO during the 2018–2019 school year at Staley Middle School (Dkt. #17 at p . 13). As also relevant here, Hoover served as an assistant instructor at the JPA during the 2021 summer, which was held on the Pearson Middle School campus (Dkt. #91 at p. 6). The City assigned a cell phone and a white Chevrolet Tahoe to Hoover as part of his position with the City (Dkt. #91 at p. 5). Hoover also had a personal cell phone, and his personal vehicle was a dark Jeep Cherokee (Dkt. #91 at pp. 9–10).

As part of the hiring process, Hoover "underwent an extensive background check, psychological evaluation, and took—and passed—a polygraph examination." (Dkt. #91 at p. 3). Part of the "screening process included questions about sexual conduct and sexual activities,

including topics of rape by threat or injury and hurting or attempting to hurt another person using a firearm." (Dkt. #91 at p. 3). Additionally, "Hoover was a certified Texas Law Enforcement Officer who met and exceeded all State mandated training required by the Texas Commission on Law Enforcement ['TCOLE']." (Dkt. #91 at p. 4).

***Jane Doe***

At all times relevant to the issues before the court, Plaintiff was a minor student enrolled in FISD schools (Dkt. #17 at p. 2). Prior to the relevant time period, Plaintiff's father was an SRO in FISD, and he would occasionally bring Plaintiff to the JPA when he worked the program (Dkt. #91 at p. 7). "Plaintiff served as a volunteer for the JPA for several years and was familiar with most of the officers who worked the JPA." (Dkt. #17 at p. 16). Plaintiff asserts that she "was known to be friendly and affectionate toward SROs." (Dkt. #17 at p. 17). Plaintiff was 16 years old when the 2021 JPA began and turned 17 years old before the 2021 JPA concluded (Dkt. #91 at p. 9).

***Hoover and Doe's Interactions at JPA***

During the 2021 JPA, Plaintiff served as a student volunteer, and Hoover worked several of the weekly sessions (Dkt. #17 at p. 15). During the 2021 JPA, several other SROs noticed Plaintiff's and Hoover's interactions, including but not limited to observations

> that Plaintiff and Hoover spent a lot of time with each other; that Plaintiff would eat lunch with the SROs; that Plaintiff and Hoover left campus to get lunch for themselves/other SROs; that one time [Plaintiff] wore Hoover's hat all day; that Officer Wilcox saw Plaintiff leaning against Hoover with her back to [his] chest; that Plaintiff and Hoover had apparently discussed Plaintiff's recent break-up; that Officer Crouch witnessed Plaintiff "massaging" [Hoover's] shoulders on the bleachers and on another occasion, Hoover [e]mbracing Plaintiff from behind[]; that Officer Baughman observed Plaintiff scratching or massaging Hoover's back or the two tickling each other; and Officer Thomason [discovered] Plaintiff and Hoover talking together in a[ ]locked room.

(Dkt. #91 at p. 17).

As Plaintiff and Hoover were getting closer, on June 29, 2021, Plaintiff put her phone number into Hoover's personal cell phone (Dkt. #91 at p. 10). Hoover and Plaintiff increasingly began texting and calling one another (Dkt. #91 at p. 10). Indeed, "Hoover's personal cell phone recorded 2,030 incoming and 1,567 outgoing phone interactions with the Plaintiff." (Dkt. #91 at p. 10).

***Hoover Sexually Assaults Doe***

After the 2021 JPA had concluded, and before students returned to school for the 2021–2022 school year, Hoover sexually assaulted Doe on at least four separate occasions. The first instance occurred in Plaintiff's vehicle after the two ate lunch together on July 26, 2021 (Dkt. #91 at p. 11). The following three instances occurred in Plaintiff's mother's home while her mother was away from the home on July 27 and 29, 2021, and August 6, 2021 (Dkt. #91 at pp. 11–14).

**LEGAL STANDARD**

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses to help "secure the just, speedy and inexpensive determination of every action." *Nat'l Cas. Co. v. Kiva Const. & Eng'g, Inc.*, 496 Fed. App'x 446, 449 (5th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Certain Underwriters at Lloyd's, London v. Axon Pressure Prod. Inc.*, 951 F.3d 248, 255 (5th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). All inferences must be construed in the light most favorable to the nonmoving party. *See id.*; *Osprey Ship Mgmt. Inc. v. Foster*, 387 Fed. App'x 425, 429 (5th Cir.

2010). "[T]he substantive law will identify which facts are material. This means [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Gibson v. Collier*, 920 F.3d 212, 219 (5th Cir.), *cert. denied*, 140 S. Ct. 653 (2019) (citing *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019)) (internal quotations omitted).

The party moving for summary judgment has the burden of showing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 191 (5th Cir. 2011). "[W]here the movant bears the burden of proof at trial, the movant 'must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor.'" *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 302 (5th Cir. 2020) (citation omitted). However, if the movant does not bear the burden of proof at trial, the movant is entitled to summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Gonzales v. ConocoPhillips Co.*, 806 Fed. App'x 289, 291 (5th Cir. 2020) (citing *Celotex*, 477 U.S. at 323). Once the movant has carried its burden, the nonmovant "must go beyond the pleadings and identify specific evidence in the record showing that there is a genuine issue for trial." *Powers v. Northside Indep. Sch. Dist.*, 951 F.3d 298, 307 (5th Cir. 2020). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Malbrough v. Stelly*, 814 Fed. App'x 798, 802 (5th Cir. 2020) (citing *Anderson*, 477 U.S. at 249–50).

## ANALYSIS

Plaintiff's Amended Complaint alleges four causes of action but only the following three are discussed herein: (1) violations of Title IX by FISD; (2) violations of § 1983 by FISD; (3)

violations of § 1983 by the City (Dkt. #17). On August 20, 2024, Plaintiff voluntarily dismissed the fourth cause of action, which was alleged violations of § 1983 by then-Defendant Springer (Dkt. #47). At the motion to dismiss stage, the court determined that Plaintiff had plausibly alleged sufficient facts in her Amended Complaint to proceed with discovery. Following formal discovery, the parties submitted the instant Motions for Summary Judgment. The court addresses the motions below.

**Alleged Title IX Violations by FISD**

As discussed in the court's September 30, 2024 Memorandum Opinion and Order, Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal Financial assistance." 20 U.S.C. § 1681(a). The Supreme Court of the United States has "rejected the use of agency principles to impute liability to the [school] district for the misconduct of its teachers." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 642 (1999). Similarly, the Court has rejected a negligence standard, or "holding the [school] district liable for its failure to react to teacher-student harassment of which it knew or *should have known*." *Id.* (emphasis in original). Instead, school districts can only be held liable for damages "where the [school] district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge." *Id.*

In considering whether a school district can be liable under a deliberate indifference theory, the school district "cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.* at 644. In other words, the party with actual knowledge who acts with deliberate indifference must have the authority to punish the wrongdoer and remedy the hostile

environment. *See id.* at 645 ("These factors combine to limit a [Title IX funding] recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's programs"). "[A]ctual knowledge[] means that the school must have actual, not constructive, knowledge of sexual harassment. Specifically, the school must have actual knowledge that harassment has occurred, is occurring, or that there is a substantial risk that sexual abuse would occur." *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (internal citations and quotation marks omitted).

***1. Actual Knowledge or Knowledge of a Substantial Risk***

Plaintiff must prove that the evidence establishes that an appropriate official at FISD had actual knowledge or knowledge of a substantial risk of the harassment she suffered. "That knowledge requirement cannot be satisfied by showing that the school district should have known there was a substantial risk of abuse. It requires the plaintiff to establish that the 'district actually knew that there was a substantial risk that sexual abuse would occur.'" *M.E. v. Alvin Indep. Sch. Dist.*, 840 F. App'x 773, 775 (5th Cir. 2020) (quoting *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 652–53 (5th Cir. 1997)).

Here, the summary judgment evidence establishes that FISD did not have actual knowledge of the harassment Plaintiff suffered at the hands of Hoover, nor did FISD have actual knowledge of a substantial risk of the harassment Plaintiff would later suffer.[1] At best, Plaintiff has established

[1] While Plaintiff claims the court found her allegations sufficient at the motion to dismiss stage, and that the evidence now conclusively establishes the same, the court finds that the evidence does not go far enough to satisfy the actual knowledge standard at the summary judgment stage. The evidence merely proves what Plaintiff originally alleged. In allowing the case to proceed, the court left the door open for Plaintiff's evidence to further develop her assertions regarding FISD's knowledge of Hoover's actions. However, it supported what Plaintiff originally alleged and nothing further. At most, the evidence establishes that FISD knew Hoover enjoyed the company of female students at the Staley Middle School campus. This is insufficient to establish actual knowledge.

that FISD staff at Staley Middle School witnessed Hoover giving candy to students, "hanging around" with students in the cafeteria, allowing students to be late to class because they were at his office, allowing students to come to his office during class, and signing students' yearbooks (Dkt. #97, Exhibit 1 at pp. 505–10). While the evidence shows that this behavior was only directed toward female students, it does not establish that any FISD employee had actual knowledge of Hoover's actions during the summer in the 2021 JPA. The evidence also does not establish that Hoover's actions with female students during the school year at Staley Middle School provided FISD employees with the knowledge of a substantial risk that Hoover would sexually assault Plaintiff after the 2021 JPA—held at a different middle school campus—had concluded.

As in *M.E.*, the Fifth Circuit noted that "[s]chool administrators were aware of a close—likely inappropriately close—relationship between [the student] and [the SRO]. But before [the SRO's] arrest, there were no allegations of any sexual harassment." 840 F. App'x at 776. Similarly, prior to Hoover's arrest—for actions that happened outside the purview of FISD or the City—there were no allegations of sexual harassment against Hoover. In contrast to *M.E.*, FISD employees were not aware of a "likely inappropriately close" relationship between Hoover and Plaintiff. Further distinguishing this case from *M.E.*, the victim was a student at the campus where the SRO was assigned. Here, Hoover was never assigned to work at a campus where Plaintiff was enrolled, nor are there any known instances of Hoover sexually assaulting a student enrolled at Staley Middle School. Regardless, as in *M.E.*, the present case may have involved "'red flags' that should have alerted the district of a substantial risk" of assault; however, "the law requires that the district actually knew of the risk, not just that it should have known." *Id.* Thus, based on the evidence before the court, Plaintiff has not met the "high bar" to establish that FISD had actual knowledge.

Without actual knowledge, Plaintiff's cause of action for violations of Title IX cannot survive. *M.E.*, 840 F. App'x at 775 ("To establish liability, *plaintiffs must demonstrate* that [the school district] had actual knowledge that [the student] was at a significant risk for sexual abuse by [the SRO] *and* that the school's response amounted to deliberate indifference.") (emphasis added). Thus, because the evidence establishes that no appropriate official at FISD had actual knowledge or knowledge of a substantial risk of the abuse Plaintiff suffered, the court need not address whether FISD's response was deliberately indifferent. Accordingly, FISD is entitled to summary judgment on Plaintiff's Title IX claim.[2]

**Constitutional Violations under § 1983**

Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. In other words, § 1983 serves to prohibit a person acting under color of law from violating citizens' constitutional rights. *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) ("To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.") (internal citation and quotation marks omitted).

[2] Because Plaintiff has not established that FISD had actual knowledge or knowledge of a substantial risk, the court need not address Plaintiff's allegations of pre-assault and post-assault deliberate indifference or heightened risk.

The evidence establishes that Hoover's actions, whether or not actionable under § 1983, were taken as an employee of the City (Dkt. #105, Exhibit 7 at p. 23). That is, the City and FISD expressly contracted in the relevant MOU that FISD does not employ SROs. Indeed, SROs are independent contractors for FISD and are not under the control of FISD (Dkt. #105, Exhibit 7 at p. 23). Further, the City's Standard Operating Procedure 96.01 explicitly states: "SROs are a police officer first, employed by this department and responsible for carrying out all duties and responsibilities as a police officer." (Dkt. #105, Exhibit 6 at p. 2). Accordingly, the court finds that FISD is entitled to summary judgment on Plaintiff's allegations of substantive due process and equal protection. The court considers the City's liability below.

***1. Constitutional Violations***

It is clear based on the evidence, and the parties do not dispute, that Plaintiff's right to bodily integrity was violated when Hoover sexually assaulted Plaintiff on each of the four separate occasions. Thus, the remaining question for the court is whether Hoover was acting under color of law when he committed the violations.

***2. Color of Law***

Plaintiff argues Hoover was acting under color of law based on the following allegations: (1) Hoover's relationship with Plaintiff grew out of his role as an SRO in JPA: (2) Hoover took advantage of his position of authority as an SRO at JPA; (3) Hoover used the authority of his position by telling Plaintiff he ran her license plate and knew where she parked her car; (4) Hoover used the authority of his position by telling Plaintiff that he would use truth serum on her if he had to; (5) Hoover coerced Plaintiff into complying by referencing he had his gun; (6) Hoover gave the implicit threat that he would never be held accountable because he could pass a lie detector

test; and (7) Hoover was on duty during each instance of sexual misconduct (Dkt. #17 at pp. 22–23).

The City disputes each of Plaintiff's allegations as follows: (1) Plaintiff's interactions with Hoover at JPA were by "happenstance and not the catalyst" that led to Plaintiff's constitutional violations; (2) Hoover did not take advantage of his position as an SRO because "Plaintiff did not fear police officers nor was she afraid of Hoover"; (3) Hoover running Plaintiff's license plate "was unintentional and happened when he was on patrol duty"; (4) Hoover's alleged threat to use truth serum was a "fantastical private statement[]"; (5) Hoover did not reference having his gun during the incidents of sexual assault; (6) Hoover did not claim that he would not be caught because he knows how to pass a lie detector test; and (7) Hoover was not on duty during the sexual assaults (Dkt. #91 at pp. 20–22). Having reviewed the evidence, the court finds that there is a genuine issue of material fact as to the first through sixth allegations. Each of these allegations in question are met with contradicting evidence—especially in light of Plaintiff's deposition testimony and that of Hoover—which leads to an issue of credibility, and such determination is the role of the jury.

Regarding Plaintiff's last allegation, that "Hoover was on duty during each instance of sexual misconduct," the City argues that "Hoover was <u>never</u> on duty at any of the times he committed sexual misconduct with Plaintiff." (Dkt. #91 at p. 21) (emphasis in original). As support, the City cites *Becerra v. Asher*, 105 F.3d 1042 (5th Cir. 1997). At first glance, with the details provided by the City, *Becerra* and the instant case appear to be analogous. The City notes that *Becerra* found the

> school employee did not act under the color of state law because he first molested the student five months after the student withdrew from the school where the defendant taught, there was no evidence of physical sexual abuse occurring at the school, the school employee was not the student's teacher "before, during, and after the sexual abuse," and the school employee's contacts with the student "were in no

> way part of his duties as a state employee, were not school-sponsored, and were not reported to any school official."

(Dkt. #91 at p. 22). The same can be said for Hoover on each point. However, there is one clear distinction. Hoover was working during each of the four incidents as they occurred on Monday, July 26, 2021, between 12:10 p.m. and 5:43 p.m.; Tuesday, July 27, 2021, between 2:41 p.m. and 5:41 p.m.; Thursday, July 29, 2021, between 11:10 a.m. and 4:11 p.m.; and Friday, August 6, 2021, between 2:30 p.m. and 4:48 p.m. (Dkt. #91 at pp. 11–14). In contrast, the two incidents in *Becerra* occurred on August 29 and September 12, 1992, both Saturdays. 105 F.3d at 1044.

There is no competent summary judgment evidence before the court to support a finding that Hoover was not on duty and expected to be performing official duties as a police officer during each incident. In fact, Hoover affirmatively testified that on the dates of the first, second, and third incidents, he clocked out at 5:30 p.m. (Dkt. #93, Exhibit 1 at pp. 52–53, 56, 62). Hoover further testified that "a couple of [the assaults] occurred while I was on duty" and while he was "[s]cheduled to be at the schools." (Dkt. #93, Exhibit 1 at p. 7).

Accordingly, Plaintiff has established that Hoover was on duty at least three of the four times he violated her constitutional rights. On duty and under color of law, however, are not synonymous. As such, the court continues with its analysis accordingly.[3]

***Monell* Liability**

**1. *Official Policy or Custom***

In the Fifth Circuit, *Monell* liability

[3] Plaintiff's equal protection claim is subsumed by her substantive due process claim, which occurs when a plaintiff fails "to argue that 'the damages that she could recover . . . based on [the] alleged violation of her equal protection rights would be any more extensive than the damages that she could recover based on the substantive due process violation.'" *Doe v. Beaumont Indep. Sch. Dist.*, 615 F. Supp. 3d 471, 490 (E.D. Tex. 2022) (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 458 (5th Cir. 1994)); *Doe v. Beaumont I.S.D.*, 8 F. Supp. 2d 596, 613 (E.D. Tex. 1998). Here, Plaintiff alleges the same damages for both her substantive due process claim and equal protection claim: "Doe is entitled to nominal damages, compensatory damages for emotional pain, suffering, mental anguish and other non-pecuniary losses." (Dkt. #17 at pp. 29, 31).

> requires proof of "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy (or custom)." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)(quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). To establish the existence of a widespread custom, of which the County policymaker knew or should have known, the plaintiff must show more than a single constitutional violation. *Piotrowski*, 237 F.3d 581.

*Hall v. Robinson*, 618 F. App'x 759, (5th Cir. 2015).

The first and second elements of *Monell* liability are established in this case. FISD and the City entered into a written agreement, the MOU, that requires SROs to serve in a limited role as counselors for students (Dkt. #105, Exhibit 7). Further, the City's General Orders, Standard Operating Procedures, and the MOU are official policies of the City and/or FISD of which relevant City and FISD policy makers had actual knowledge (Dkt. #105, Exhibits 5, 6, 7) (including signatures of respective policy makers). However, Plaintiff asserts that an SRO's duty to counsel is an amorphous duty that is not clearly defined, and the policy was the driving force behind Hoover's assault of Plaintiff (Dkt. #17 at pp. 26–27). Plaintiff further asserts that this policy is in violation of Texas Education Code § 37.081 (Dkt. #17 at p. 27). The court disagrees with both assertions.

First, the role of "counselor" for SROs is clearly defined in the City's Standard Operating Procedure language that is repeated in the MOU. The Standard Operating Procedure reads as follows:

> **96.01.08 STUDENT CONSULTATION.**
>
> A. SROs are *not intended to replace any school counselor* nor are they to conduct or offer any formal psychological counseling.
> B. SROs will advise students on responsibilities and procedures *concerning criminal matters*.
> C. SROs will give advice to help resolve issues between students that *involve matters that may result in criminal violations, disturbances or disruptions*.
> D. *SROs should not*, in most cases, *go to the homes of students* except in actual emergencies or under conditions that warrant such a visit. Should a school administrator request an SRO make or accompany school staff on a home visit,

> SROs should notify an SRO Sergeant or appropriate supervisor prior to the visit. Under emergency or exigent circumstances, such notification may occur after the fact.

(Dkt. #105, Exhibit 6 at p. 5) (emphasis added). This language clearly establishes the role of "counselor" for SROs. Nowhere in this definition of the consultation SROs are permitted to provide to students does it go outside the bounds of an SRO's role as a law enforcement officer. This section of the Standard Operating Procedure, which is repeated in the MOU, confines counseling to legitimate policing duties and expressly prohibits SROs from providing counseling more suitable for school counselors or psychiatrists.

Next, Plaintiff claims the SRO contract violates Texas Education Code § 37.081 because it "clearly reflects duties that require 'contact with students unrelated to the law enforcement duties of the peace officer, resource officer, or security personnel.'" (Dkt. #104 at p. 27) (citing TEX. EDUC. CODE § 37.081(d-2)(2)). Plaintiff further asserts that the requirement to "provide limited counseling to students with personal problems" is not in compliance with § 37.081(d-4) which states that its purpose is "to ensure [SROs] are tasked only with duties related to law enforcement intervention and not tasked with behavioral or administrative duties better addressed by other district employees." (Dkt. #101 at p. 30) (citing TEX. EDUC. CODE § 37.081(d-4)). Based on Plaintiff's expansive definition of "counseling," combined with Hoover's actions, the official policy in question could appear to violate §§ 37.081(d-2), (d-4). However, reading the policy in the context of the four corners of the documents, the term counseling is not as broad as Plaintiff would have the court believe. Based on a plain reading of the Standard Operating Procedure and the MOU, the court finds that the policy clearly defines the role of "counselor" for SROs in a manner that comports with the Texas Education Code and confines SROs' counseling to issues related to crime reduction and law enforcement objectives.

Ultimately, it was not the City's or FISD's policy that was the moving force behind Plaintiff's constitutional violations. It was the individual, criminal actions of Hoover—which deviated from that well-defined policy—that were the cause of Plaintiff's constitutional violations. The evidence establishes that Hoover treated his interactions at JPA and leading up to the assaults as personal rather than in his role as an SRO (Dkt. #93 at pp. 88–89). Indeed, Hoover testified as follows:

> Q: Did you provide this information - - this informal counseling to her as a SRO or more as a personal friend?
> A: More as a personal friend.
> Q: This was not your official duty as an SRO or a JPA instructor to advise about sending inappropriate pictures, was it?
> A: No.
> Q: Did you consider your interactions with her on these type of topics to be in your role as a personal friend versus a police officer?
> A: Yes.
> Q: What developed next?
> A: Just more in depth of her, just for lack of better - - venting about how she felt she was being treated at home.
> Q: What type of general things was she venting about?
> A: Not being able to do certain things, go with friends places, and just that her father was keeping a tight leash on her.

(Dkt. #93 at pp. 88–89).

As the foregoing testimony illustrates, Plaintiff's constitutional violations were caused by Hoover's clear deviation from the "Student Consultation" section of the City's Standard Operating Procedures and the City's and FISD's MOU. Hoover's interactions with Plaintiff that Plaintiff labels as "counseling" were wholly unrelated to the counseling expected from SROs and were advanced by Hoover's personal, criminal objectives. Accordingly, FISD and the City are entitled to summary judgment on Plaintiff's official policy claims.

***2. Failure to Train or Supervise***

Plaintiff alleges the City and FISD are responsible for Hoover's violation of Plaintiff's constitutional rights based on a failure to train or supervise theory (Dkt. #17 at pp. 31–35). The

court first notes that Plaintiff's claims against FISD fail as a matter of law. The Supreme Court of the United States stated, for example, that "a municipality cannot be held liable *solely* because it employs a tortfeasor," and the text of § 1983 "plainly imposes liability on a government that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." *Monell*, 436 U.S. at 691–92. As discussed above, FISD did not employ Hoover or any other SRO. Indeed, SROs are expressly independent contractors for FISD and are not under the control of FISD (Dkt. #105, Exhibit 7 at p. 23). Accordingly, as FISD did not employ Hoover, it is entitled to summary judgment on Plaintiff's claims based on a failure to train or supervise theory of liability.

Regarding the City, the evidence before the court is that Hoover was a Texas Commission of Law Enforcement ("TCOLE") certified police officer with specific National Association of School Resource Officers ("NASRO") and Texas Association of School Resource Officers ("TASRO") training (Dkt. #91 at p. 4; Dkt. #93, Exhibit 1 at pp. 84–93). The City argues this is dispositive of Plaintiff's failure to train theory (Dkt. #91 at p. 30). Plaintiff, on the other hand, argues that the City failed to train or supervise SROs, that any training or supervision provided was inadequate, and that such failure or inadequacy made constitutional violations highly predictable (Dkt. #17 at p. 32).

The court finds that Plaintiff has not carried her burden to establish the City's liability. Plaintiff's evidence establishes two incidents where City SROs were arrested for criminal activity with FISD students (Dkt. #114, Exhibit 5). However, Hoover was the first discovered. This is insufficient to establish municipal liability. *City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing,

unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, *considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation*.") (emphasis added). Because the court has found that Plaintiff has not established an unconstitutional policy or custom, "considerably more proof" is necessary to establish municipal liability. Plaintiff's evidence of Hoover's criminal conduct (and that of one other SRO discovered nearly two years after Hoover's conduct) is insufficient to establish municipal liability.

Further, Plaintiff has not shown that the City was deliberately indifferent. Indeed, Plaintiff has not established "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," as required to show deliberate indifference by *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). Without deliberate indifference, a failure to train or supervise theory is precluded. *See Doe as next friend of Doe 1 v. Prosper Indep. Sch. Dist.*, No. 4:22-cv-814, 2026 WL 1284478, *9–*11 (E.D. Tex. May 11, 2026). Accordingly, the City is entitled to summary judgment on Plaintiff's failure to train or supervise theory of liability.

## CONCLUSION

Based on the foregoing, Plaintiff's Objections and Motion to Strike FISD's Summary Judgment Evidence (Dkt. #100) is **DENIED**; Defendant City's Motion for Summary Judgment (Dkt. #91) is **GRANTED**; and Defendant FISD's Motion for Summary Judgment (Dkt. #94) is **GRANTED**.

**IT IS SO ORDERED**.

**SIGNED this 8th day of September, 2026.**

AILEEN GOLDMAN DURRETT
UNITED STATES MAGISTRATE JUDGE